FILED
COURT OF APPEALS
DIVISION II

2014 DEC 30 AM 9: 46

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44642-1-II |
| Respondent, | |
| v. | |
| JESSE JAMES CLARK, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — A jury found Jesse James Clark guilty of second degree possession of stolen property, first degree extortion, and four counts of bail jumping. Clark appeals, arguing that (1) his convictions for bail jumping violate double jeopardy, (2) his convictions for second degree possession of stolen property and second degree extortion violate double jeopardy, (3) insufficient evidence supports the jury's verdicts finding him guilty of bail jumping, (4) the prosecutor committed misconduct during closing arguments, (5) the accomplice liability statute is unconstitutional, (6) the trial court improperly calculated his offender score because his convictions for possession of stolen property and extortion were the same criminal conduct, and (7) he received ineffective assistance of counsel because his counsel failed to argue same criminal conduct at sentencing. Clark's claims fail, and we affirm.

FACTS

On October 4, 2011, Jennifer Thomas was at home with her daughter. An acquaintance of Thomas', Rose Folsom, came to the house to pick up some items that Thomas had bought for Folsom's baby. While Folsom was bringing the baby items to her car, Thomas received a phone call. Folsom left while Thomas was on the phone.

A short time after Folsom left, Thomas realized that her bulldog, Jagger, was missing. 1 Thomas began searching for Jagger. She put fliers up throughout the area, and she contacted newspapers and other media. On October 8, 2011, Thomas received a series of text messages demanding pain medication and $1,000 for Jagger's return. And the text messages stated that, if Thomas did not give the thieves the drugs and money, Jagger would be tortured and killed. In one text message, the thieves told Thomas that, if she did not comply, Jagger would be cut up. Thomas also received pictures of Jagger tied up.

Thomas informed the sheriff's office about the text messages. Cowlitz County Sheriff's Detective Sergeant Bradley Thurman coordinated an undercover operation in which they posed as Thomas and arranged to meet the thieves to exchange the drugs and money for Jagger's safe return. The sheriffs used Thomas' car and waited for the thieves on a road right outside the Three Rivers Golf Course. At one point, the deputies saw a light colored pickup truck with a barrel in the back. However, when the other deputies in marked vehicles were sent to intercept the truck, they were unable to locate it. The deputies did not make contact with the thieves. Several weeks later, Jagger's decapitated body was discovered by the train tracks on the edge of the golf course.

The deputies identified Folsom, Folsom's boyfriend Johnny Jordan, and Clark as potential suspects. On October 17, Deputy Danny O'Neill spoke to Clark, but he denied ever having Jagger

2

on his property. On November 1, deputies served a search warrant at Jordan's house. They found a notebook with Jagger's name written on it and one of the fliers Thomas posted in Jordan's pocket. The deputies also found what appeared to be bloodstains in the interior of Folsom's car. On October 26, deputies executed a search warrant at Clark's home. They found rope matching the rope in the pictures the thieves texted to Thomas. They also found a makeshift shelter made with a child's toy desk in Clark's yard, and dog hair on the futon in Clark's house. Clark's white Toyota pickup truck had bloodstains on the interior and barrels of paint or solvent in the back.

The State charged Clark with first degree extortion and second degree possession of stolen property. On February 2, 2012, the trial court ordered Clark to appear for a pretrial hearing on March 27 and a trial date on April 23. When Clark appeared for his hearing on March 27, the trial court ordered him to appear for another pretrial hearing on April 19. Clark failed to appear on April 19, and he failed to appear for trial on April 23. The trial court issued a bench warrant after Clark failed to appear at his April 19 pretrial hearing, and Clark was later arrested on that warrant.

When Clark again appeared before the trial court on May 29, 2012, the trial court ordered Clark to appear for a pretrial hearing on June 19 and for trial on August 6. Clark appeared on June 19, at which time the trial court ordered him to appear for another pretrial hearing on August 2. Clark failed to appear for the August 2 pretrial hearing and the August 6 trial date. Another bench warrant was issued after Clark failed to appear at the August 2 pretrial hearing. The State charged Clark with four counts of bail jumping for failing to appear on April 19, April 23, August 2 and August 6 as ordered by the court.

The case went to a jury trial on February 26, 2013. At trial, the State presented Lori Vanderhoff's testimony. Vanderhoff was a close friend of Clark's and was staying with him during

3

October 2011. She testified that during that time, Clark was not sleeping. Around October 4, Vanderhoff saw Jagger on the front seat of Clark's truck, bleeding. Clark told Vanderhoff that he was watching Jagger for a friend. Later, Vanderhoff saw Jagger tied up outside the house near a shelter made out of a child's play school desk. While Jagger was at the house, Vanderhoff became concerned about Clark's behavior and became fearful of him. A few days later, Jagger was gone. When Vanderhoff asked about Jagger, Clark told her that she did not need to worry about Jagger anymore. And, he told her that he "beat the shit out of that fucking d——." 2 Report of Proceedings (RP) at 275. Vanderhoff moved the next day.

Dmitry Powers, Clark's neighbor, also saw Jagger tied up in front of Clark's house. Clark told Powers that he bought Jagger. A couple days later, Jagger was no longer at the house. Clark told Powers that he "beat the crap out of the dog." 3 RP at 356.

Staci Myklebust, a Cowlitz County Superior Court clerk, testified that the trial court always verbally informs defendants of the date and time they are ordered to appear in court. If the trial court forgets to inform the defendant, the prosecutor will remind the trial court. When the defendant is notified of the date and time of their required court appearances, the court clerk will check off the box on the clerk's minutes indicating that the defendant was ordered to appear. The State introduced the clerk's minutes from the dates Clark was ordered to appear and the clerk's minutes from the dates Clark failed to appear.

During closing argument, the State argued that Clark knew the dog was stolen because he gave inconsistent stories about how he got the dog. The State also argued that Clark did not care for Jagger the way a person would care for his or her pet. And, the State argued that Clark was guilty of extortion as an accomplice. In addition to hiding Jagger, the State argued that Clark took

the pictures that were sent to Thomas because the pictures showed Jagger tied up with the rope found at Clark's house. Clark either went to the area to perform the exchange, or let Folsom and Jordan use his truck to make the exchange. And, the State argued that, because of his statements to Vanderhoff and Powers, the jury could infer that Clark beat and killed Jagger and then dumped his body at the railroad tracks.

The jury found Clark guilty of extortion, second degree possession of stolen property, and four counts of bail jumping. The trial court calculated Clark's offender score at 5 and imposed standard range sentences. Clark appeals.

ANALYSIS

A.    DOUBLE JEOPARDY

The United States and Washington Constitutions prohibit double jeopardy. U.S. CONST. amend. V; WASH. CONST. art 1, § 9. This court reviews alleged violations of double jeopardy de novo. *State v. Villanueva-Gonzalez*, 180 Wn.2d 975, 979-80, 329 P.3d 78 (2014). "The prohibition on double jeopardy generally means that a person cannot be prosecuted for the same offense after being acquitted, be prosecuted for the same offense after being convicted, or receive multiple punishments for the same offense." *Villanueva-Gonzalez*, 180 Wn.2d at 980. While Clark alleges a constitutional error, determining whether Clark's convictions constitute multiple punishments for the same offense requires determination of legislative intent and presents a question of statutory interpretation. *Villanueva-Gonzalez*, 180 Wn.2d at 980. "The legislature is tasked with defining criminal offenses, and the prohibition on double jeopardy imposes '[f]ew, if any, limitations' on that power." *Villanueva-Gonzalez*, 180 Wn.2d at 980 (quoting *Sanabria v. United States*, 437 U.S. 54, 69, 98 S. Ct. 2170, 57 L. Ed. 2d 43 (1978)).

No. 44642-1-II

There are two tests that are employed to determine whether multiple convictions violate double jeopardy by imposing multiple punishments for the same offense. *Villanueva-Gonzalez*, 180 Wn.2d at 980-81. As our Supreme Court recently explained:

> The "unit of prosecution" analysis applies when a defendant has multiple convictions under the same statutory provision, and it asks "what act or course of conduct has the Legislature defined as the punishable act." [*State v. Adel*, 136 Wn.2d 629, 634, 965 P.2d 1072 (1998)]. The "[*Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 2d 306 (1932)]" analysis applies when a defendant has convictions under different statutes, and it asks whether the convictions were "the same in law and in fact." [*Adel*, 136 Wn.2d at 632-33].

*Villanueva-Gonzalez*, 180 Wn.2d at 980-81.

### 1. Unit of Prosecution—Bail Jumping

Clark argues that his multiple convictions for bail jumping violate double jeopardy. Under the unit of prosecution test, we employ principles of statutory construction to determine what the legislature intended as the punishable act. *State v. Turner*, 102 Wn. App. 202, 206, 6 P.3d 1226 (2000) (citing *Adel*, 136 Wn.2d at 634), *review denied*, 143 Wn.2d 1009 (2001). "[I]f the legislature fails to define the unit of prosecution or its intent is unclear, under the rule of lenity, any ambiguity must be 'resolved against turning a single transaction into multiple offenses.'" *State v. Tvedt*, 153 Wn.2d 705, 711, 107 P.3d 728 (2005) (quoting *Adel*, 136 Wn.2d at 635) (internal quotations marks omitted).

Under RCW 9A.76.170(1):

> Any person having been released by court order or admitted to bail with knowledge of the requirement of a subsequent personal appearance before any court of this state, or of the requirement to report to a correctional facility for service of sentence, and who fails to appear or who fails to surrender for service of sentence as required is guilty of bail jumping.

6

Based on the statutory language the unit of prosecution for bail jumping could be defined as either violating the court order releasing the defendant or the defendant's failure to appear on a specific date.

In *State v. O'Brien*, 164 Wn. App. 924, 267 P.3d 422 (2011), Division One of this court determined that the bail jumping statute was ambiguous regarding the unit of prosecution and, thus, must be interpreted in favor of the defendant. In *O'Brien*, the defendant was released under four court orders, in four different cases, that all required him to report to the jail on the same date and time. 164 Wn. App. at 927. The defendant failed to report to jail as ordered, and the State charged him with four counts of bail jumping. *O'Brien*, 164 Wn. App. at 927. The court observed that "the statute is ambiguous as to whether the legislature intended to punish the single failure to appear or the violations of multiple court orders." *O'Brien*, 164 Wn. App. at 929-30. Applying the rule of lenity to the specific facts of the case, the court determined that the unit of prosecution in the case was the defendant's single failure to report rather than the violation of four separate court orders. *O'Brien*, 164 Wn. App. at 930, 932-33. However, the *O'Brien* court was clear that its decision was based on the specific facts of the case; it did not determine that, as a matter of law, the failure to appear was the unit of prosecution for bail jumping. 164 Wn. App. 930, 932-33.

We presume that the legislature knows the existing state of case law. *Woodson v. State*, 95 Wn.2d 257, 262, 623 P.2d 683 (1980). Therefore, we presume that the legislature is aware that an ambiguity exists within the bail jumping statute—an ambiguity that must be resolved in favor of the defendant based on the facts of each case. Yet, the legislature has declined to take any action to clarify the unit of prosecution for bail jumping. Accordingly, we apply the same analysis employed in *O'Brien* to Clark's case. Here, Clark violated four separate orders from the court to

7

appear on four separate court dates. Therefore, regardless of whether the unit of prosecution is based on the number of court orders Clark violated or the number of times Clark failed to appear, the State could have charged Clark with four counts of bail jumping.

As to the two April bail jumping convictions, the clerk's minutes from February 2, demonstrate that the trial court ordered Clark to appear for a pretrial hearing on March 27 and for trial on April 23. When Clark appeared on March 27, the clerk's minutes show that the trial court ordered Clark to appear on April 19 for another pretrial hearing, but the clerk's minutes do not reference the April 23 date. Clark failed to appear on April 19 as ordered by the trial court on March 27, and he failed to appear for trial on April 23 as ordered by the trial court on February 2. Clark violated two separate court orders each time he failed to appear in April. Therefore, regardless of whether the unit of prosecution is based on the failure to appear or on court orders, Clark's two convictions for bail jumping based on his two failures to appear in April do not violate double jeopardy.

Similarly, on May 29, the clerk's minutes show that the trial court ordered Clark to appear for a pretrial hearing on June 19 and for trial on August 6. When Clark appeared on June 19, the clerk's minutes indicate that Clark was ordered to appear for another pretrial hearing on August 2, but the clerk's minutes do not specifically reference the August 6 trial date. Clark failed to appear for the August 2 pretrial hearing as ordered by the trial court on June 19, and he failed to appear for trial on August 6 as ordered by the trial court on May 29. Like the April hearing dates, each time Clark failed to appear in August, he was violating a separate court order. Therefore, neither of Clark's convictions for the bail jumping charges for the August court dates violate double jeopardy.

2.      Same Evidence Test – Extortion and Possession of Stolen Property

Clark also argues that his convictions for extortion and possession of stolen property violate double jeopardy under the "same evidence" test. Br. of Appellant at 18-20.[1] Our Supreme Court has stated that:

> Under the same evidence rule, if each offense contains elements not contained in the other offense, the offenses are different and multiple convictions can stand. [*State v. Baldwin*, 150 Wn.2d 448, 454, 78 P.3d 1005 (2003)]. The test requires the court to determine "'whether each provision requires proof of a fact which the other does not.'" [*Baldwin*, 150 Wn.2d at 455] (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)).

*State v. Jackman*, 156 Wn.2d 736, 747, 132 P.3d 136 (2006) (internal footnote omitted). Clark alleges that his convictions for possession of stolen property and extortion violate double jeopardy because "the evidence necessary to convict Mr. Clark of extortion was also sufficient to convict him of possession of stolen property." Br. of Appellant at 20.

It is undisputed that the elements of possession of stolen property and the elements of extortion are different. RCW 9A.56.160(1)(a)[2], .110.[3] However, Clark relies on *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 100 P.3d 291 (2004), to argue that his convictions violate double jeopardy because both convictions are predicated on the same act—keeping Jagger at his

---

[1] There is a four-part framework employed when analyzing whether convictions for two offenses violate double jeopardy. *State v. Freeman*, 153 Wn.2d 765, 765, 771-73, 108 P.3d 753 (2005). However, Clark limits his argument and analysis to the same evidence test, therefore we decline to address the other tests for determining whether two convictions violate double jeopardy. RAP 10.3(a)(6).

[2] A person is guilty of possessing stolen property in the second degree if: (1) he possesses property that (2) he knows is stolen and (3) the property is worth more than $750.

[3] A person is guilty of extortion if he (1) obtains or attempts to obtain (2) property by (3) threatening the owner of the property.

house. In *Orange*, the defendant was convicted of both first degree assault and first degree attempted murder based on shooting the victim. 152 Wn.2d at 803. Our Supreme Court held that the defendant's convictions violated double jeopardy because the evidence used to convict the defendant of first degree attempted murder necessarily proved that the defendant committed first degree assault. *Orange*, 152 Wn.2d at 820. Clark argues that same situation exists here; the State proved that Clark was guilty of extortion because he kept Jagger at his house. And, this evidence necessarily proved that Clark was guilty of possession of stolen property. We disagree.

The State did not simply prove that Clark was an accomplice to the extortion plan because he held Jagger hostage. The State proved that Clark committed possession of stolen property by proving that Jagger was at Clark's house and that Clark knew he was stolen because of how he treated Jagger. While the State relied in part on the evidence that Jagger was in Clark's house to prove Clark committed extortion, the State also relied on other evidence to prove that Clark was guilty of extortion. The State proved that Clark took the pictures that were used in the ransom text messages; the State proved that Clark beat and killed Jagger and then disposed of Jagger's body on the railroad tracks; and the State proved that Clark's truck was used to attempt to exchange Jagger for the ransom. There were numerous acts on which the State based the extortion charge, at least three of which were not limited to Clark keeping Jagger at his house. Accordingly, Clark's convictions for possession of stolen property and extortion do not violate double jeopardy under the same evidence test.

B.     SUFFICIENCY OF THE EVIDENCE —BAIL JUMPING

"The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt

10

beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201. All "reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Salinas*, 119 Wn.2d at 201. Circumstantial and direct evidence are deemed equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). "Credibility determinations are for the trier of fact and cannot be reviewed on appeal." *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Clark argues that there was insufficient evidence to support his convictions for bail jumping because (1) the State did not prove that Clark was aware of the exact time he was required to appear and (2) the State did not prove exactly what time Clark failed to appear at court. There was sufficient evidence to support the jury's verdicts finding Clark guilty of all four counts of bail jumping; therefore, Clark's arguments lack merit.

As noted above, under RCW 9A.76.170(1),

> Any person having been released by court order or admitted to bail with knowledge of the requirement of a subsequent personal appearance before any court of this state, or of the requirement to report to a correctional facility for service of sentence, and who fails to appear or who fails to surrender for service of sentence as required is guilty of bail jumping.

The State must prove that the defendant had notice of the required court date. *State v. Cardwell*, 155 Wn. App. 41, 47, 226 P.3d 243 (2010). And, under *State v. Coleman*, 155 Wn. App. 951, 964, 231 P.3d 212 (2010), *review denied*, 170 Wn.2d 1016 (2011), the State must prove that the defendant failed to appear at the time he was ordered to appear. In *Coleman*, the defendant was ordered to appear at 9:00 AM, and the State presented evidence that, at 8:30 AM, the court clerk

noted that the hearing had been stricken and the court had issued a bench warrant. 155 Wn. App. at 963-64. The court determined that there was insufficient evidence because the clerk's minutes did not indicate that the defendant failed to appear at 9:00 AM as ordered. *Coleman*, 155 Wn. App. at 964.

First, Clark argues that there was insufficient evidence to support his convictions for bail jumping because the State did not present sufficient evidence to prove that Clark knew about the date and time that he was required to appear. Clark relies on *United States v. Lo*, 231 F.3d 471 (9th Cir. 2000), to argue that testimony regarding the routine practice of the trial court was insufficient to prove that Clark was given notice of the court date. However, *Lo* does not support Clark's contention. In *Lo*, the court determined that the testimony in that case was insufficient to establish a routine practice that proved mail fraud. In *Lo*, the jury would have had to infer that the mortgage company created a particular document, and then started the process that resulted in mailing the document; and, the court determined that this chain of events was too tenuous to present sufficient of evidence of mail fraud. 231 F.3d at 476. The court recognized that, as the chain of inference based on usual practices gets longer, the probability that nothing went wrong in administering those practices lessens. "At some point, a reasonable doubt arises concerning whether, as Murphy's Law predicts, that which can go wrong did go wrong." *Lo*, 231 F.3d at 477.

Here, there is only one inference that the jury was required to make—that the trial court followed its usual practice and notified Clark of the court date when it was set. The likelihood of something going wrong when the trial court ordered Clark to appear at his court dates is not a chain of events that is so tenuous as to be insufficient as a matter of law. Accordingly, the clerk's testimony that it was the trial court's routine practice to inform the defendant of the date and time

of his court date was sufficient evidence to prove that Clark was notified of the date and time he was required to appear.

Second, Clark argues that the State failed to present sufficient evidence to prove that Clark failed to appear at the ordered time. Here, the State presented testimony from the clerks who were in court on the days that Clark was required to appear. The clerks testified that Clark did not appear at court. And, the State introduced the bench warrants that were issued after Clark failed to appear. Contrary to Clark's assertion, *Coleman* does not require that the State present direct evidence that Clark was not in the court at exactly 9:00 AM. Rather, in *Coleman*, the clerk's minutes that established the defendant failed to appear were entered *before* the time the defendant was ordered to appear. 155 Wn. App. at 963.

Here, the evidence showed that Clark failed to appear at the time he was ordered to appear. For the pretrial readiness hearing dates (April 19 and August 2), the clerks who were present in court on these dates testified that pretrial hearings start at 9 AM and that the trial court informs defendants that pretrial hearings start at 9 AM. The bench warrants for Clark's failure to appear for his pretrial readiness hearings were issued at 11:29 AM for the April 19 hearing date and at 2:47 PM for the August 2 prehearing date. Therefore, the State presented sufficient evidence to prove that Clark did not appear at court when ordered to do so. As for the trial dates (April 23 and August 6), the clerks testified that trials are scheduled to begin at 8:30 AM and that the trial court informs defendants that trials start at 8:30 AM. The clerk's minutes for April 23 show that Clark was not present at court at 8:52 AM, after the time he was ordered to appear. And, the clerk's minutes for August 6 show that Clark was not at court at 8:57 AM, after he was ordered to appear. Accordingly,

there was sufficient evidence to show that Clark failed to appear at the time he was ordered to appear.[4]

## C.    PROSECUTORIAL MISCONDUCT

To prevail on a claim of prosecutorial misconduct, Clark must show that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012) (citing *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011)). First, we must determine that the prosecutor's conduct was improper. *Emery*, 174 Wn.2d at 759. If we determine that the prosecutor's conduct was improper, we then determine whether the prosecutor's improper conduct resulted in prejudice to Clark. *Emery*, 174 Wn.2d at 757-78, 760-61. If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *Emery*, 174 Wn.2d at 760-61 (citing *State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997)).

Here, Clark did not object to any of the comments he now characterizes as prosecutorial misconduct; therefore, Clark is presumed to have waived any error. The defendant is presumed to have waived any error because objections are required to prevent additional improper remarks and abuse of the appellate process. *Emery*, 174 Wn.2d at 762. Accordingly, we apply a heightened standard which requires the defendant to show that "(1) 'no curative instruction would have

---

[4] To the extent that Clark is arguing that if he was ordered to appear at 8:30, he could only be found guilty of bail jumping if he is absent at court exactly at 8:30, this argument necessarily leads to absurd results. First, a defendant could be found guilty of bail jumping if he is five minutes late to court. Second, a defendant would not be guilty of bail jumping if he was present at 8:30 and left immediately thereafter before the scheduled court proceeding commences.

obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at 761 (quoting *Thorgerson*, 172 Wn.2d at 455). When reviewing a prosecutor's misconduct that was not objected to, we focus "less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Emery*, 174 Wn.2d at 762.

In closing argument, prosecutors are afforded wide latitude to draw and express reasonable inferences from the evidence. *State v. Reed*, 168 Wn. App. 553, 577, 278 P.3d 203, *review denied*, 176 Wn.2d 1009 (2012). When analyzing prejudice, we do not look at the comment in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007), *cert. denied*, 554 U.S. 922 (2008). We presume the jury follows the court's instructions. *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010).

Clark alleges that there were four specific instances of misconduct committed by the prosecutor during closing arguments. First, he argues that the prosecutor improperly quantified the beyond a reasonable doubt standard. Second, he argues that the prosecutor improperly bolstered the State's case. Third, he argues that the prosecutor improperly appealed to the passions and prejudices of the jury. Fourth, he argues that the prosecutor improperly disparaged defense counsel. And, Clark argues the cumulative effect of the prosecutor's misconduct denied him a fair trial.

Here, the prosecutor did not improperly quantify the burden of proof, improperly bolster the State's case, or improperly appeal to the passions or prejudices of the jury. And, although the prosecutor improperly disparaged defense counsel during rebuttal closing argument, the

No. 44642-1-II

prosecutor's comment was not so flagrant and prejudicial that it could not have been cured. Furthermore, the cumulative error doctrine does not apply.

### 1. Quantifying Beyond a Reasonable Doubt

The prosecutor commits misconduct if he or she minimizes the burden of proof or attempts to quantify the level of certainty required to satisfy the beyond a reasonable doubt standard. *State v. Fuller*, 169 Wn. App. 797, 825, 282 P.3d 126 (2012), *review denied*, 176 Wn.2d 1006 (2013). Clark argues that the prosecutor improperly attempted to quantify the beyond a reasonable doubt standard by stating:

> Well, the law says you don't have to be convinced beyond all doubt, beyond any doubt, 99%.

4 RP at 506. The prosecutor goes on to state:

> You have to beyond [sic] a reasonable doubt. And Judge Evans defines it for us. He tells us that a reasonable doubt is one for which a reason exists, and if you have an abiding belief; a belief that lasts, a belief that endures in the Defendant's guilt, then you are convinced . . . beyond a reasonable doubt.

4 RP at 506. Within the context of the prosecutor's argument, it is clear that the prosecutor is not improperly quantifying the level of certainty required to satisfy the beyond a reasonable doubt standard. When the prosecutor referred to 99 percent, he was telling the jury what the beyond a reasonable doubt standard is not, the prosecutor is not attempting to tell the jury what the standard is. And, the prosecutor immediately discusses the correct definition of beyond a reasonable doubt directly from the court's jury instructions. The prosecutor's argument was not an improper statement quantifying the beyond a reasonable doubt standard.

16

2.      Bolstering the State's Case

"Improper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness." *Thorgerson*, 172 Wn.2d at 443. However, it is not misconduct for the prosecutor to argue that other evidence presented at trial corroborates a witness's testimony. *State v. Gentry*, 125 Wn.2d 570, 641, 888 P.2d 1105 (1995). Clark argues that the prosecutor improperly bolstered the State's case and vouched for Vanderhoff's credibility by arguing;

> And what Ms. Vanderhoff tells the police, everything she says is corroborated by what the police find when they finally get enough evidence to raid and search the Defendant's house.

4 RP at 499. The prosecutor went on to list all the evidence the police found that corroborated Vanderhoff's testimony. The prosecutor did not rely on references to evidence outside the record to argue that Vanderhoff was credible. And, the prosecutor did not express a personal opinion as to Vanderhoff's credibility. Instead, the prosecutor relied on evidence presented at trial to argue that Vanderhoff's testimony was credible because other evidence corroborated it. There was nothing improper about the prosecutor's argument; thus, the prosecutor did not commit misconduct by bolstering the State's case or expressing a personal belief regarding Vanderhoff's credibility.

Clark also argues that the prosecutor alluded to evidence outside the record when he stated that Vanderhoff testified that Clark had been acting erratically and engaging in bizarre behavior. And, he alleges that the prosecutor improperly stated that Clark told Vanderhoff she was not welcome on the property. The prosecutor's comments regarding Clark's bizarre and erratic behavior were supported by Vanderhoff's testimony. Vanderhoff testified that Clark was not

sleeping and his behavior was causing her to be concerned and fearful. Vanderhoff's testimony supports the inference that Clark's behavior could be characterized as erratic or bizarre.

Clark is correct that Vanderhoff did not testify that Clark told her she was unwelcome on the property. However, she did state that she had become fearful of Clark and that was why she left. It is reasonable to infer from her statements that Clark's behavior made her feel unwelcome. And, to the extent that the prosecutor attributed Vanderhoff's feeling to a statement made by Clark, any possible prejudice was cured by the trial court's instructions to the jury. The jury was explicitly instructed that the lawyers' remarks during closing argument are not evidence. And, the jury was instructed to disregard any remark that was not supported by the evidence; therefore, we must presume that the jury disregarded the inference that Clark told Vanderhoff she was unwelcome. Accordingly, the prosecutor's statement could not have had a substantial likelihood of affecting the jury's verdict.

3. Appealing to the Passions and Prejudices of the Jury

A prosecutor may not make statements that are unsupported by evidence or invite the jurors to decide a case based on emotional appeals to their passions and prejudices. *State v. Jones*, 71 Wn. App. 798, 808, 863 P.2d 85 (1993), *review denied*, 124 Wn.2d 1018 (1994). Clark argues that the prosecutor improperly appealed to the passions and prejudices of the jury by arguing:

> That's the way you treat a hostage. That's what he was doing. Holding the bulldog hostage. Why? Easy answer and it's an old answer: greed. Greed. Lust for money, lust for drugs. Because that's what Jagger meant to the Defendant and the people he was working with. To him, Jagger was not a pet, Jagger was not a friend of the family, Jagger was just a way to get what he wants. And he's willing to do whatever he wants—needs to get from him. Dog has value to him, because of what it can get him. And when the dog can't get him anything anymore, dog's not worth anything to him. And we see where that ended up.

4 RP at 497.

Contrary to Clark's assertion, the prosecutor was not improperly appealing to the passions and prejudices of the jury. Putting aside the fact that the entire case was about Clark killing Jagger, a family pet, for money and drugs which will naturally evoke emotion from jurors, the prosecutor's argument was made specifically regarding Clark's knowledge that Jagger was stolen. The State was required to prove that Clark knew Jagger was stolen. Clark claimed that he did not know Jagger was stolen; he told Vanderhoff he was watching Jagger for a friend and he told Powers that he had bought Jagger as a pet. The prosecutor was arguing that the way Clark treated Jagger demonstrated that he viewed Jagger not as a pet, but rather as an object that served a particular purpose. The prosecutor's argument was not specifically calculated to inflame the passions and prejudices of the jury. Rather, the prosecutor's argument was based on making inferences to support the conclusion that Clark knew Jagger was stolen. The prosecutor's comments were not improper.

4. Disparaging Defense Counsel

It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn counsel's integrity. *Thorgerson*, 172 Wn.2d at 451. A prosecutor's conduct is improper when the prosecutor's arguments accuse defense counsel of engaging in "sleight of hand" or use terms such as "bogus" or "deception." *Thorgerson*, 172 Wn.2d at 451-52. Clark contends that the prosecutor disparaged defense counsel at the beginning of rebuttal closing argument when the prosecutor said:

> Rebuttal argument is always my favorite part of the trial because, by this point, I get to hear what the Defense arguments are and they never fail to entertain. But

then I get another chance to talk to you folks about what's reasonable and what the evidence really shows.

4 RP at 526. The prosecutor essentially made light of defense counsel's arguments. And, the prosecutor implied that defense counsel's arguments were unreasonable and misrepresented the evidence. The prosecutor improperly disparaged defense counsel, and the comments were improper.

However, Clark did not object to the prosecutor's comments. Although improper, Clark cannot show that any resulting prejudice caused by the prosecutor's comments could not have been cured by a timely objection and instruction. If Clark had objected to the prosecutor's comments, the trial court could have instructed the jury to disregard the comment. Because we presume that the jury follows the trial court's instructions, any resulting prejudice from the comment could have been cured by the trial court's instruction. Accordingly, Clark has not met his burden to demonstrate that the prosecutor's comments disparaging defense counsel were so flagrant and ill-intentioned that reversal is required.

5.      Cumulative Error

Clark argues that the cumulative effect of the prosecutor's misconduct deprived him of a fair trial. Under the cumulative error doctrine, a combination of errors may require reversal even when each individual error is otherwise harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006), *cert. denied*, 551 U.S. 1137 (2007). However, the doctrine does not apply where there are few errors or the errors have little to no effect on the outcome of the trial. *Weber*, 159 Wn.2d at 279. Here, there were two instances where the prosecutor's conduct was improper: the prosecutor's disparaging comments in rebuttal closing argument and the prosecutor's misstatement

regarding Vanderhoff's testimony. Here, both instances of improper conduct were relatively minor and Clark has not demonstrated that they had an effect on the outcome of the trial. Accordingly, the cumulative error doctrine does not entitle Clark to relief.

## D. ACCOMPLICE LIABILITY INSTRUCTION

Clark argues that the accomplice liability statute is unconstitutionally overbroad because it punishes protected speech. This court has twice considered, and rejected, this same argument. In *Coleman*, 155 Wn. App. at 960, Division One of this court held that the accomplice liability instruction was not unconstitutionally overbroad because [the statute's] "sweep avoids protected speech activities that are not performed in aid of a crime and that only consequentially further the crime." We explicitly adopted Division One's holding in *State v. Ferguson*, 164 Wn. App. 370, 376, 264 P.3d 575 (2011), *review denied*, 173 Wn.2d 1035 (2012).

Clark also argues that *Coleman* and *Ferguson* were wrongly decided because they did not apply the appropriate standard that the United States Supreme Court articulates in *Brandenberg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969). We disagree. Therefore, we do not further consider Clark's claim that the accomplice liability statute is unconstitutionally overbroad.[5]

## E. OFFENDER SCORE CALCULATION

Clark may not challenge the calculation of his offender score because of the belief that, if asked, the trial court would have found the defendant's current offenses encompassed the same

---

[5] In *Ferguson*, we explicitly held that the accomplice liability statute is not unconstitutional because "it does not forbid the mere advocacy of law violation that is protected under the holding of *Brandenburg*." 164 Wn. App. at 376. Therefore, Clark is incorrect in his assertion that *Coleman* and *Ferguson* were wrongly decided because they did not apply the *Brandenburg* standard when determining that the accomplice liability statute is not unconstitutionally overbroad.

criminal conduct. *State v. Nitsch*, 100 Wn. App. 512, 524-25, 997 P.2d 1000, *review denied*, 141 Wn.2d 1030 (2000); *In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 874, 50 P.3d 618 (2002). Whether convictions are the same criminal conduct includes factual questions for the trial court to resolve. *Nitsch*, 100 Wn. App. at 524-25. And, the failure to request that the trial court do a same criminal conduct analysis is "a failure to identify a factual dispute for the court's resolution and a failure to request an exercise of the court's discretion." *Nitsch*, 100 Wn. App. at 520. Therefore, the failure to request a same criminal conduct analysis in the trial court leaves this court with an insufficient record to review whether the trial court abused its discretion when making the factual findings supporting a same criminal conduct determination. *Nitsch*, 100 Wn. App. at 524. Because Clark failed to argue that his convictions were the same criminal conduct at sentencing, he has waived his objection to the trial court's offender score calculation based on his assertion that his extortion and possession of stolen property convictions are the same criminal conduct.

F.      INEFFECTIVE ASSISTANCE OF COUNSEL

Clark claims that he received ineffective assistance of counsel because his counsel did not request that the trial court consider same criminal conduct during sentencing. A defendant claiming ineffective assistance of counsel has the burden to establish that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Because same criminal conduct favors the defendant, the defendant bears the burden of proving that his convictions are the same criminal conduct. *State v. Graciano*, 176 Wn.2d 531, 539, 295 P.3d 219 (2013). Therefore, in the ineffective assistance of counsel context, the defendant must show that

it was objectively unreasonable for defense counsel to fail to make a same criminal conduct argument because the same criminal conduct argument would have been successful.

To prevail on a same criminal conduct claim, the defendant must prove that the convictions required the same criminal intent, were committed at the same time and place, and involved the same victim. RCW 9.94A.589(1)(a). Here, the State argued, and presented sufficient evidence to prove, that one way in which Clark was an accomplice to extortion was by using his truck to perform the exchange of Jagger for the money and drugs. This conduct was committed at a different time and place than keeping Jagger at his house. Accordingly, Clark has not shown that a same criminal conduct argument would have been successful and his ineffective assistance of counsel claim fails.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will instead be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Worswick, P.J.

Sutton, J.